**IN THE COURT OF APPEALS OF IOWA**

No. 15-0851
Filed April 27, 2016

**IN THE MATTER OF THE**
**GUARDIANSHIP OF**

**JEANETTE KLIEGE**

_____

**IN THE MATTER OF THE**
**CONSERVATORSHIP OF**

**JEANETTE KLIEGE.**

_____

        Appeal from the Iowa District Court for Butler County, Rustin T. Davenport, Judge.

        Juliana Burd appeals the orders creating a conservatorship for her mother, Jeanette Kliege, and appointing non-relatives to serve as Kliege's guardian and conservator. **AFFIRMED.**

        Barry S. Kaplan of Kaplan & Freese, LLP, Marshalltown, for appellant.

        Patrick G. Vickers of Vickers Law Office, Greene, for appellee.

        Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

In this consolidated appeal, we review two orders concerning Jeanette Kliege and her substantial estate. Kliege's daughter, Juliana Burd, appeals the order appointing a non-relative to serve as Kliege's guardian, arguing that it is in Kliege's best interest that Burd serve as her guardian. She also appeals the order creating a conservatorship for Kliege and appointing a non-relative to serve as conservator. Burd argues the statutory requirements for appointment of a conservator have not been met, but, in the alternative, she requests she be appointed conservator. Because the appointments of the guardian and the conservator made by the district court serve Kliege's best interests, we affirm.

**I. Background Facts and Proceedings.**

Jeanette Kliege is ninety years of age, and she owns a residence and more than two-hundred acres of farmland near Parkersburg. She has two daughters: Burd, who lives in Blue Springs, Missouri, and Janola Taylor, who lives in West Des Moines. After her husband died in 2009, Kliege executed both general and medical powers of attorney, empowering her daughters to manage her affairs and finances.

Ted Junker, who lives in New Hartford, met Kliege over twenty years ago at church. He began leasing farmland from the Klieges in 2006 and occasionally helped the Klieges around the farm. After Kliege's husband passed away, Junker began checking in on Kliege every other week or so, and he continued to plow the snow from her driveway. Junker noticed a change in Kliege in December 2013; he was concerned she was not eating every day and seemed confused, so he began checking on her more frequently.

Dorothea Kampman also met Kliege through her church and has known her for approximately thirty-five years. Kampman, a retired nurse, also checked on Kliege regularly following her husband's passing. On a Saturday in late December 2013, Kampman found Kliege to be "somewhat confused" and her medications "in disarray." Kampman spent an hour and a half organizing the medications and provided Kliege with detailed instructions on how to take them. She then telephoned Burd and Taylor to notify them of her concerns. When Kampman visited Kliege the following Monday, two days later, she found Kliege had "completely rearranged" her medications and was still not taking them correctly. Kampman was concerned that Kliege was not eating frequently enough. Kampman again contacted Burd and Taylor to notify them of her concerns about Kliege's safety and well-being.

Junker went to Kliege's home that Wednesday, Christmas Day, to check on Kliege. Junker knocked and called her phone, but Kliege did not answer. Concerned, he called Burd and Taylor, but neither would grant Junker permission to enter the house without their presence. Eventually, Taylor agreed to make the trip from West Des Moines to check on Kliege. When Taylor arrived three hours later, she and Junker entered the home and found Kliege lying on her bedroom floor with a fractured hip, confused as to what had happened. She was transported to the hospital where she was diagnosed with dehydration, dementia, and depression.

When Kliege was discharged from the hospital, Taylor placed her in a nursing home in Parkersburg, unbeknownst to Burd. In May 2014, Burd, unhappy with Taylor's decision, attempted to remove Kliege from the nursing

home so that she could resume living on the farm. Taylor learned of Burd's plans and successfully blocked the attempt.

Without Taylor's knowledge, Burd transported Kliege to an attorney's office where a petition for voluntary appointment of a guardian was prepared, seeking Burd's appointment as Kliege's guardian. On May 30, 2014, after finding Burd was "fully qualified" and "the appropriate person to serve," the district court appointed Burd as guardian. Later, in September 2014, Burd gave the nursing home notice of her intent to remove Kliege, and the nursing home in turn informed Taylor. Taylor also learned of the existence of the voluntary guardianship.

Taylor filed an application to dissolve the guardianship, alleging Kliege's signature was obtained by Burd when Kliege was incompetent. The court granted Taylor's request for a temporary injunction to keep Burd from removing Kliege from the nursing home, appointed a guardian ad litem for Kliege, revoked the letters of appointment issued to Burd, and appointed Junker temporary guardian. The guardian ad litem filed a petition for involuntary appointment of a conservator, proposing Lincoln Savings Bank be appointed.

A hearing concerning both the guardianship and the conservatorship was held on April 1 and 2, 2015. The guardian ad litem asserted Junker should serve as Kliege's guardian and Lincoln Savings Bank as her conservator.

In its April 17, 2015 order, the district court found Kliege to be incompetent, as defined by the Iowa Code, and it concluded a guardianship and conservatorship was necessary. The court further found "a great deal of antipathy" between Burd and Taylor, which prevented the sisters from working

together or communicating effectively. Because appointment of one of the daughters as guardian would cause "strife and battles to ensue," the court found Junker should serve as Kliege's guardian. The court also determined that a conservatorship was warranted and appointed Lincoln Savings Bank, "a neutral, professional entity," because of the "hostility" between the two daughters.

Burd appeals.

## II. Scope and Standard of Review.

Actions for the involuntary appointment of guardians and conservators are tried at law. *See* Iowa Code § 633.33 (2013). Therefore, our review is for the correction of errors at law. *See* Iowa R. App. P. 6.907; *In re Conservatorship of Deremiah*, 477 N.W.2d 691, 692 (Iowa Ct. App. 1991). Findings of fact are binding on us if supported by substantial evidence. Iowa R. App. P. 6.904(3)(a). Substantial evidence exists if the finding may be reasonably inferred from the evidence. *Deremiah*, 477 N.W.2d at 693.

## III. Appointment of a Guardian.

Burd does not contest the district court's finding that Kliege meets the requirements for appointment of a guardian. *See* Iowa Code §§ 633.3(23)(a) (defining "incompetent"), 633.552(2) (setting forth the requirements for appointment of a guardian). She only challenges the appointment of Junker as Kliege's guardian, arguing it is in Kliege's best interest that she be appointed guardian.

Once the criteria for appointment of a guardian has been proved, the district court is afforded discretion in selecting a guardian to appoint. *See In re Guardianship & Conservatorship of Reed*, 468 N.W.2d 819, 822-23 (Iowa 1991)

(noting that a jury may decide whether the statutory ground for appointment of a guardian has been proved and, if "answered affirmatively, the decisional act of appointing a guardian is then made by the court"); *In re Guardianship & Conservatorship of Schmidt*, 401 N.W.2d 37, 39 (Iowa 1987) ("[T]he trial court is authorized to exercise its own judgment on who might best serve in the fiduciary capacity."). Appellate courts "will not interfere in the selection of a guardian made by a trial court unless it is shown that there has been a clear abuse of discretion in making the appointment." *Arent v. Arent*, 32 N.W.2d 660, 661 (Iowa 1948). If two or more statutorily-qualified and suitable persons are seeking guardianship of an adult ward, the district court must exercise its discretion to "determine which proposed guardian's appointment would better serve the best interests and well-being of the ward." *In re Guardianship of M.E.B.*, No. 06-0583, 2007 WL 1345895, at *5 (Iowa Ct. App. May 9, 2007). To be statutorily qualified to serve as a guardian, a person must be an Iowa resident of full age and competent. Iowa Code § 633.63(1). In order for a nonresident to be appointed guardian, they must be competent and serve as co-guardian with a resident guardian. *See id.* § 663.64(a). A nonresident may serve as the sole guardian only if "good cause" is shown. *See id.* Burd has lived in Missouri since 1976 and seeks to serve alone as guardian. Therefore, she must show good cause as to why she should be appointed guardian. *See In re Estate of Oelberg*, 414 N.W.2d 672, 675 (Iowa Ct. App. 1987).

There is no question both Junker and Burd meet the competency requirement to serve as Kliege's guardian. Burd does not contest Junker's qualifications or suitability to be Kliege's guardian. The district court's order does

not address whether Burd has shown good cause to be appointed alone to serve as Kliege's guardian. Assuming Burd has shown good cause, the district court was confronted with a decision between two competent guardians. It then had to decide who to appoint based on Kliege's best interests and well-being. In making this determination, the court considered the parties' relationships with and their history of caring for Kliege. It considered Burd's contentious relationship with Taylor and found that selecting one of Kliege's daughters to serve as guardian over the other would cause more strife, which was contrary to Kliege's best interests. Because Junker was able to remain neutral and make determinations based on Kliege's best interests, he was selected as Kliege's guardian.

Burd concedes there is no evidence Junker would act contrary to Kliege's best interests should he continue as her permanent guardian. However, she argues that she is more likely to serve Kliege's best interests because she is Kliege's daughter. Familial relationship is not, alone, a determinative factor in selecting a guardian. *See Schmidt*, 401 N.W.2d at 39; *see M.E.B.*, 2007 WL 1345895, at *5 ("There is no express statutory preference for the appointment of a guardian for an adult ward."). As the *Schmidt* court noted: "From time to time wards need more protection from kin than from strangers." 401 N.W.2d at 39. Although closeness of consanguinity is considered, it is only one piece to be considered in the best-interest analysis. *See M.E.B.*, 2007 WL 1345895, at *5.

Burd also cites the fact that she was named Kliege's guardian in the voluntary guardianship action and requests it be considered as evidence of Kliege's preference for her guardian. She further claims there is no evidence in

the record that Kliege would prefer Junker to be her guardian. Kliege's preference of guardian is not determinative, however. *See Schmidt*, 401 N.W.2d at 39 (noting the district court "is not bound by the views of the family, or even the preferences of the ward" in selecting a guardian).

Burd complains that Junker has "no experience and no real desire" to provide for Kliege's necessities. The evidence as to Junker's past actions does not reflect this view. Although he is not a member of Kliege's family, Junker lived in the same area as Kliege for over twenty years and has maintained a close relationship with Kliege since 2006 by renting her land, assisting around the farm, and checking on Kliege's well-being. Junker noticed when Kliege's health declined in December 2013, and in response, he increased the frequency of his visits. It was Junker's visit to Kliege on Christmas Day and his insistence on investigating further in the face of her daughters' resistance that led to the discovery of Kliege on her bedroom floor, her hip broken, dehydrated, and confused—but still alive. The record further shows that Junker visited Kliege at the nursing home on several occasions before being appointed as her temporary guardian, when he began visiting on a near-weekly basis. When Junker noticed that the nursing-home staff was not providing Kliege with her hearing aids daily, he spoke to staff and the problem was corrected.

Junker has demonstrated willingness to aid in Kliege's care in the future as well. He testified that he's grown to care about Kliege. Although Junker allows Kliege's daughters to attend to her personal needs, he testified he would be willing to do that as well if necessary. Importantly, Junker is able to get along with both of Kliege's daughters. Although the antagonistic nature of their

relationship puts Junker "in a difficult position between the two of them," Junker testified his concern is for Kliege.

The record does not support a finding that Burd can better attend to Kliege's best interests. Although she made the trip to Iowa every thirty-five and forty-five days to take Kliege grocery shopping, Burd lives in Missouri and has since 1976. Despite receiving two calls from Kampman with concerns about Kliege's well-being in the days leading up to Christmas, Burd refused to consent to Junker's unaccompanied entry into Kliege's home on Christmas Day to check on her well-being. As a result, Kliege was denied medical care for three additional hours until Taylor arrived to enter the home with Junker. Burd attempted to remove Kliege from the nursing home and return her to her residence without consulting Kliege's doctor. Although Burd testified it never occurred to her to consult the doctor before implementing the change, she indicated she did not feel consulting with the doctor was "advisable." Kliege's doctor testified the moving process can be traumatizing to elderly people with dementia. Although evidence shows that moving Kliege from the nursing home would not be in her best interests, Burd still evinced her intent to do so if she is made guardian. Burd has shown an unwillingness or disinterest in working with Kliege's doctor and the nursing-home staff to assure Kliege receives the best care possible as is evidenced by her unwillingness to participate in the nursing home's monthly care conferences or to engage in conference calls or meetings with Kliege's doctor. She has evinced a poor attitude toward the nursing-home staff in general by being difficult and rude in her interactions.

Also of concern is the ongoing conflict between Burd and Taylor and the impact it has on Kliege. Burd did not inform Taylor of her plans to move Kliege from the nursing home or of the voluntary guardianship. She justified her failure to inform Taylor of the decision to move Kliege by arguing Taylor failed to inform her she was placing Kliege in the nursing home initially: "Because she did it to me, so then I could do it to her." While Burd claims the conflict stems from the fact they have joint powers of attorney, there is no indication the situation would improve if Burd had the power to make decisions for Kliege unilaterally.

The district court properly exercised its discretion in appointing Junker to serve as Kliege's guardian, and we affirm that order.

**IV. Appointment of a Conservator.**

Burd also appeals the conservatorship order, challenging the sufficiency of the evidence to meet the statutory requirements for establishing a conservatorship. She also challenges the appointment of Lincoln Savings Bank to serve as Kliege's conservator. In the event this court agrees the statutory grounds for a conservatorship have been established, Burd argues that she should be appointed conservator.

In order to meet the statutory requirements for appointment of a conservator, there must be evidence the proposed ward's "decision-making capacity is so impaired that the person is unable to make, communicate, or carry out important decisions concerning the person's financial affairs." Iowa Code § 633.566(2)(a). The petitioner must prove by clear and convincing evidence the need to appoint a conservator. *See id.* §§ 633.551(1)-(2), 633.556(1). Although Burd agrees Kliege's decision-making capacity is impaired such that she is

unable to care for her personal safety or to attend to necessities like food, shelter, clothing, or medical care without risk of physical injury or illness, *see id.* § 633.552(2)(a), she claims Kliege is able to make, communicate, and carry out important decisions relating to her financial affairs.

The same evidence that shows Kliege is in need of a guardian supports appointment of a conservator. Kliege shows signs of at least moderate to severe dementia. Her doctor opined that based on her background, experience, training, and treatment of Kliege, that Kliege "should not be making [financial] decisions." Burd's own testimony demonstrates Kliege relied on Burd to a great extent before she was moved to a nursing home. Since that time, her abilities have further declined.

The question then is who should serve as conservator. Once again, the district court had discretion in selecting a conservator. *See Schmidt*, 401 N.W.2d at 39. Burd argues she is better qualified to serve as Kliege's conservator based on her past assistance with Kliege's financial matters. She notes that she never charged fees for assisting Kliege, unlike Lincoln Savings Bank.

As with the appointing of a guardian, there is no statutory preference for selecting a conservator of an adult. *See* Iowa Code § 633.571 (setting forth preferences concerning appointment of a conservator for minor children before concluding that "[s]ubject to these preferences, the court shall appoint as conservator a qualified and suitable person who is willing to serve in that capacity"). "The matter of who is to act as [conservator] rests very largely in the sound discretion of the court making the appointment." *In re Guardianship of Hruska*, 298 N.W. 664, 666 (Iowa 1941) (concerning the selection of a "guardian

of property," now known as a conservator). Therefore, we review the court's selection of Lincoln Savings Bank as conservator for an abuse of discretion. *See id.* (affirming selection of conservator for an incompetent person where no abuse of discretion was shown).

The district court noted it had "some reservations" about appointing Lincoln Savings Bank to act as conservator. It noted that although Burd has not charged a financial fee for handling Kliege's finances, the investments Burd made on Kliege's behalf receive less than a 2% rate of return. The court determined that the return on these investments, though low, would likely be sufficient to pay Kliege's expenses due to Kliege's "substantial assets." However, the court found that any fee charged by Lincoln Savings Bank may be balanced by the greater rate of return the bank could receive on its investments of Kliege's assets. The tipping factor in favor of Lincoln Savings Bank was "the hostility between the daughters, as reflected in Janola Taylor's claim of Juliana Burd mishandling her mother's money." Because the conflict between her daughters is contrary to Kliege's best interests, the court concluded "a neutral, professional entity should serve as conservator." This was a proper exercise of discretion.

Because there is substantial evidence in the record establishing the statutory grounds for appointment of a conservator, and because the court properly exercised its discretion in selecting Lincoln Savings Bank to serve as conservator, we affirm the conservatorship order.

**AFFIRMED.**